MASONIC HOME OF MISSOURI, a Corporation, Appellant, v. CLAUDE E. WINDSOR, NAAMAH E. WINDSOR and ELEANOR G. DIFFENDERFER, Guardian and Curator of W. I. DIFFENDERFER.—92 S. W. (2d) 713.

Division Two, March 21, 1936.

*E. B. Kellerman* and *Arch A. Johnson* for appellant.

*W. I. Mayfield* and *A. W. Curry* for respondents.

. BOHLING, C.—Appeal from a judgment and decree setting aside a foreclosure sale under a deed of trust and reinstating the note and deed of trust as live obligations.

On April 7, 1927, Claude E. Windsor and Naamah E. Windsor executed and delivered, for value, their certain $7,000, six per centum, note, payable April 7, 1932, to W. I. Diffenderfer, or order, securing the same by a first deed of trust conveying certain farm land to W. W. Curry as trustee. On July 7, 1927, said Diffenderfer endorsed said note, for full value, to Masonic Home of Missouri, a corporation. The note and deed of trust carried acceleration of payment clauses in the event of default in the payment of interest. Default occurring in the payment of interest, said endorsee placed said note with E. B. Kellerman, an attorney for collection. The deed of trust was foreclosed in July, 1930, and Mr. Kellerman purchased the real estate so sold on behalf of said endorsee for $1,000.

Crediting the note with the proceeds of said sale, said Masonic Home instituted suit on December 31, 1930, against said makers and Eleanor G. Diffenderfer as guardian and curator of W. I. Diffenderfer, who had been adjudged an habitual drunkard and incompetent, for $6,742, the principal of the balance due on said note and interest.

The decree was entered under an amended joint answer and cross-bill of Claude E.. Windsor and Naamah E. Windsor. Said pleading admits the validity of the note, the deed of trust securing the same and the foreclosure sale, except as hereinafter specifically noted; and, insofar as material here, alleges, in substance, that the foreclosure sale was had in July, 1930; that said Kellerman purchased said real estate at said sale for and on behalf of plaintiff, bidding therefor $1,000, and took title in the name of plaintiff; "that a reasonable market value of said farm on the date of sale" was $8,000; that said Kellerman was well acquainted with said land and knew that the reasonable market value of said farm was $8,000; that the bid of $1,000 "was wholly inadequate, inequitable and unconscionable;" and that said

real estate was of sufficient value and ample to pay said note, and by reason thereof said debt has been fully paid and discharged; that on the date of said sale "they went and talked to Mr. Kellerman before the sale, about the sale and note and mortgage, and asked Mr. Kellerman whether or not defendants should bid at said sale, and that the said E. B. Kellerman told the defendants and advised them not to bid at said sale and let him, Kellerman, bid said lands in for and [on] behalf of Masonic Home. Defendants say that they thought and understood that when the lands were bid in by the said E. B. Kellerman that would fully discharge and pay said note; that the said E. B. Kellerman told these defendants that he would make arrangements with the defendants whereby said note would be taken up and discharged and that he would see that if the defendants had to pay any of said note that the plaintiff would convey said lands to these defendants." The prayer was for a decree that said note had been fully paid and discharged, and "to set aside the sale made by plaintiff as of July —, 1930, . . ." and for general relief. The separate answer of Eleanor G. Diffenderfer sets up like facts in defense to appellant's cause of action, but does not ask affirmative relief. The replies are, in effect, general denials. The court made a special finding of facts and "ordered and decreed that the sale under deed of trust be and is set aside. and the note sued on is wholly reinstated as a living note and deed of trust is reinstated as a living security."

Respondents have not favored this court with a brief.

Since we are of the opinion, under the competent evidence, defendants have failed to show themselves entitled to the relief prayed, we do not set out the findings of fact by the chancellor, and pass the attack made by appellant on the sufficiency of said findings to support the decree entered by the court [Hewitt v. Price, 204 Mo. 31, 46(3), 102 S. W. 647, 651(3); Robinson v. McCune, 128 Mo. 577, 587, 30 S. W. 156, 158(2). But see Howard v. Zweigart (Mo. en banc), 197 S. W. 46, 49(3); Twedell v. Treasure (Mo. App.), 44 S. W. (2d) 216, 227(3); Bauman v. Western & So. Ind. Co. (Mo. App.), 77 S. W. (2d) 496, 497(1); and cases, upon our own findings, reversed and remanded with directions as Antonopoulos v. Chouteau Trust Co., 337 Mo. 252, 84 S. W. (2d) 1059, 1062], and any issue as to the sufficiency of the allegations of respondent's answer to state a cause of action warranting the relief prayed [Compare, for instance, the rulings and comment in Young v. Kansas City Life Ins. Co., 329 Mo. 130, 43 S. W. (2d) 1046; Gates Hotel Co. v. Davis Real Est. Co., 331 Mo. 107, 52 S. W. (2d) 1017; Schwarz v. Kellogg (Mo.), 243 S. W. 179, 183(2, 5); Medsker v. Swaney, 45 Mo. 273, 278].

While equity will intervene in a proper case to relieve against fraud or mistake in a trustee's sale, fraud or mistake is not to be presumed, but should be proved by clear, convincing and cogent evi-

dence or circumstances. [Schwarz v. Kellogg (Mo.), 243 S. W. 179, 183(6); Judah v. Pitts, 333 Mo. 301, 311, 62 S. W. (2d) 715, 720(3).]

Respondents' case rests upon the testimony of respondent Claude E. Windsor with reference to his conversations with appellant's agent Kellerman. We shall not undertake to point out all the inconsistencies of his testimony. This witness testified he ascertained from Mr. Curry, the trustee, how he could protect himself and how much it would take; that he knew Mr. Kellerman was representing appellant; that he talked to Mr. Kellerman and Mr. Kellerman said he thought there would be no use in witness' bidding this farm in; that Kellerman would buy it in for the Home and we would have a satisfactory settlement; that witness attended the sale but didn't bid on it "because I thought Mr. Kellerman and I was going to have a satisfactory settlement. . . . ." We shall ascertain from the evidence, first, what this "settlement" was and, next, when it was arrived at.

We understand from his testimony that Mr. Kellerman agreed to take $3,500 and another farm owned by witness in exchange for the real estate described in the deed of trust. This "settlement" was established by evidence of the following nature: "He positively left that impression with me. . . . He told me he would take $3,500 and that farm. . . . That's the way I understood it. . . . I thought he was going to make that trade, that was the intention, that is the reason I didn't buy in this farm at the time of the sale. . . . I never done anything because I was authorized not to bid. . . . He told me he would buy it in and he would take this other farm in. *He hadn't appraised it yet.* Q. He told you he would take that farm? A. He told me he would write in to the company about it. Q. Mr. Windsor, Mr. Kellerman offered to sell you this place after the sale for $6,500 did he not? A. Cash. He said $6,500 cash. He wanted $3,500 down. Q. But he did offer it to you for $6,500? A. Yes, he did." In answer to a question witness stated he did not have the $3,500 to make the down payment and in answer to the next question that witness offered Mr. Kellerman *a payment* of $3,500 in money and the other land. The following occurred upon direct examination: "Q. Tell what conversation you had with Mr. Kellerman about protecting your interest in this foreclosure sale. A. I asked him if there would be any use of my going down there, we talked the trade over. I was going to take him out and show him this farm and we was going to try to get together on the trade, and I asked him, down there in front of Koby's shop: 'Mr. Kellerman, do you think there is any use of me coming up there?' and he said: 'No, I will bid the farm in *for the Home* and we will try to make some satisfactory settlement.' " And on cross-examination: "Q. You say you had that kind of a deal made? A. That's what I understood. Q. Tell the Court what he said? A. I asked him in front of Fred Koby's, I said, 'Mr. Kellerman,

do you think there is any use of me going up there and bidding on that place?' He said, 'No, I don't think there is.' He said, 'I will go up there and *buy it in for the Home and I will try then to make a deal with you and some satisfactory settlement.*' Q. Did you ever get to the point where he [Kellerman] said 'all right?' A. Well, I understood it that way.''

As to whether this ''settlement'' was reached before or after the foreclosure sale, respondent Windsor testified in answer to inquiries bearing directly upon that fact as follows: ''I figured that I did. . . . I supposed I did, yes. Q. Did you? A. I couldn't tell by the way it turned out, I thought I did. . . . Why, after the sale he [Kellerman] said 'You come over to the office and we will try to make a dicker;'' and witness went to Kellerman's office. It appears that Mr. Kellerman made a trip to Springfield which seemed to be of importance to the witness in fixing the time of the ''settlement.'' The record recites: ''. . . He went to Springfield and after that he told me he would have to write to the people in the Home. Q. That was before the farm was sold? A. I don't remember. Q. Didn't you say before that up to the time and on the day of the sale you had a trade made with him by which you were to take this farm, on the day of the sale that you had that arrangement with him? A. I don't remember saying that. Q. That was after the sale, wasn't it? A. Well, I couldn't say, I don't remember. . . . Q. The sale; just say whether or not that was before or after the sale, or that you don't know. A. . . . I don't know.'' He testified that on the day of the sale it was agreed that Kellerman was to trade witness the farm. ''Q. As between you and him the trade was made? A. Wait a minute. Now, at the time, he went to Springfield, that gets me bothered, after he went to Springfield Mr. Kellerman always brought in the Home after that. Q. Was that before or after the sale? A. Well, I honestly can't tell you, I don't remember.''

Mr. Curry, the trustee, also represented respondent Diffenderfer in the transaction, and testified Mr. Kellerman asked him to get together with Mr. Windsor and see what could be done about redeeming the land; that he said Mr. Windsor but he ''didn't see Mr. Kellerman about redeeming it.'' ''Mr. Kellerman told me he had a deal on with Windsor and he thought we could get this thing straightened out. That's as near as I know from Kellerman. . . . He [Kellerman] never told me he had made the deal. . . . I never raised any money for my client in the matter.''

Appellant's evidence was to the effect that there never was a meeting of the minds of respondent Windsor and Kellerman on any agreement with reference to the reconveyance to respondent Windsor of the real estate foreclosed; that respondent Windsor was told to be at the sale and bid or that some third party might acquire the

real estate; and that they held the sale a short time until Mr. Windsor arrived. W. W. Martin, President of the Masonic Home of Missouri, testified: "I never authorized him [Kellerman] to exchange this for any land."

Two subsequent deeds of trust against the land were unsatisfied of record.

Without entering upon an extended discussion of the evidence, what witness Windsor did "not know," or what "impression" he may have had, or what he "thought," or "understood," or "supposed," or "figured" does not rise to the dignity of evidence establishing an, issuable fact. These observations, excepting "I don't know," of the witness were mere conclusions, not evidence of probative value. He could not state whether the "settlement" was agreed upon before or after the foreclosure, but did say that, at the time of the foreclosure, his land had not been appraised by appellant's agent—the only logical conclusion from which is that the minds of the parties had not met on the terms of an agreement. His testimony, therefore, establishes, as of the time of the foreclosure, only a willingness on the part of agent Kellerman, in the event appellant acquired the property, to negotiate ("dicker") for some satisfactory settlement. This is not the clear, convincing and cogent evidence (or evidence) of fraud practiced on respondents or of any mistake on the part of respondents warranting setting aside the foreclosure sale. The evidence not only fails to establish the existence, prior to the foreclosure, of an agreement to be performed in the future, but it falls short of establishing even a voluntary promise, unsupported by a consideration, to make any specific trade, and, hence, at the time of the foreclosure no contract existed to be breached. Respondents were *sui juris*. No confidential relation existed. They could and should have ascertained with some definiteness what agent Kellerman's client was willing to do with reference to their reacquisition of the land or what credit, if any, said client would endorse upon the note should they refrain from bidding to the end that appellant might acquire the real estate; and, failing in this, should have exercised reasonable diligence in an effort to protect their interest at the sale. [See Phoenix Trust Co. v. Holt (Mo. en banc), 312 Mo. 563, 279 S. W. 714, 717.] ▆ The evidence discloses that appellant was willing to take a $1,000 loss, and that, after the foreclosure, agent Kellerman endeavored to negotiate a settlement. The offer was rejected. While we think the preponderance of the credible evidence is with appellant, the evidence having probative value favorable to respondents only went to establish a parol agreement after the sale for exchanging the real estate acquired by appellant at the foreclosure proceedings. Under the facts of the instant case, this agreement between respondent Windsor and agent Kellerman, as well as agent Kellerman's authority, was within the

Statute of Frauds [Sec. 2967, R. S. 1929, Mo. Stat. Ann., p. 1835; State ex rel. v. Haid, 333 Mo. 701, 706, 60 S. W. (2d) 41, 43(5)]. It should have been in writing to be legally effective. Not a scintilla of evidence was offered of any written agreement or written authority to agent Kellerman to exchange said real estate for other real estate. Contra, the uncontradicted evidence is that no such authority had ever been conferred upon Mr. Kellerman. The parol agreement imposed no legal obligation on either party.

The only issue between appellants and respondents remaining in the case is the inadequacy of the bid for the land at the foreclosure sale. As stated in Charles Green Real Estate Co. v. St. Louis Mutual Home Building Co., 196 Mo. 358, 372, 93 S. W. 1111, 1115, citing cases: ''It has been many times held by this court that inadequacy of price, in the absence of fraud or unfair dealing, is not a sufficient ground for setting aside a sale under a mortgage or deed of trust. . . .'' [See, also, Judah v. Pitts, 333 Mo. 301, 312(4), 62 S. W. (2d) 715, 720(8), and cases cited.] Appellant is entitled to collect the balance due on its debt if possible [See New York Store Merc. Co. v. Thurmond, 186 Mo. 410, 426, 85 S. W. 333, 336].

Respondents Windsor set up in their cross-bill an independent cause of action asking judgment against W. I. Diffenderfer based on a claim that said respondents were entitled to certain rents and profits from said real estate. As such matter was not necessary or germane to said respondents' defense against appellant's suit on the note, it had no proper place in the case, and no judgment can be rendered thereon in this proceeding. [Fulton v. Fisher, 239 Mo. 116, 130, 143 S. W. 438, 442(2); Campbell v. Spotts, 331 Mo. 974, 984, 55 S. W. (2d) 986, 990(7).]

The decree of the trial court is reversed and the cause remanded with directions to enter judgment for appellant as prayed in the petition. *Cooley* and *Westhues*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. All the judges concur.